Marc J. Randazza, Esq.,
Arizona Bar No. 027861
Randazza Legal Group
6525 Warm Springs Rd., Suite 100
Las Vegas, NV 89118
888-667-1113
305-437-7662 (fax)
MJR@randazza.com

Attorney for Plaintiff,
LIBERTY MEDIA HOLDINGS, LLC

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Liberty Media Holdings, LLC<br><br>    Plaintiff,<br><br>    vs.<br><br>Vinigay.com; Gustavo Paladeski; Vinicius Alves<br><br>    Defendants. | Case No. 11-CV-0280-PHX-LOA<br><br>**RESPONSE TO ORDER TO SHOW CAUSE** |

### RESPONSE TO ORDER TO SHOW CAUSE

The Court issued an Order to Show Cause as to why this case should not be dismissed with prejudice. (Doc. 38). The Court's Order is based upon the extraterritoriality principle limiting United States Copyright law:

> [T]he Court has discovered controlling case law that if Defendants' acts of infringement occurred outside the United States, Plaintiff's claims are not actionable. (Doc. 38 at 1)

The Court's analysis relied upon factual presumptions, which are not supported by the record or which are contradicted by the record. In addition, the legal analysis applying the extraterritoriality exception is incomplete.

1

The Order states:

> Based on the allegations in the First Amended Complaint, the evidence presented at the July 8, 2011 default damages hearing and related affidavits and memoranda, and the reasonable inferences from the facts presented, the facts indicate or suggest that Defendants consented to Plaintiff's terms of its works' authorized use according to Plaintiff's website, CorbinFisher.com, and then lawfully downloaded Plaintiff's three videos after paying the required fees. Thereafter, Defendants unlawfully uploaded and redistributed Plaintiff's works through Defendants' tube site, vinigay.com, in Brazil. Thus, Defendants' infringement occurred entirely outside the United States and, therefore, Plaintiff has no cause of action under the Copyright Act for Defendants' acts of infringement. (Doc. 38 at 2).

There is nothing in the record to support the inference that the Defendants "*lawfully downloaded Plaintiff's three videos after paying the required fees*," nor is there anything in the record to support the conclusion that the Defendants engaged in absolutely **no part** of their unlawful actions while in the United States. Furthermore, the record reflects ample facts to show that at least **part** of the Defendants' actions took place in the United States, thus nullifying any conclusion that the Copyright infringement took place entirely extraterritorially.

**I.    Factual inferences should not be resolved in favor of the Defendants.**

When deciding a motion to dismiss all factual allegations are presumed to be true and all reasonable inferences are made in favor of the plaintiff. *Nordbrock v. United States*, 173 F. Supp. 2d 959, 967 (D. Ariz. 2000) (citing *Miree v. DeKalb Cnty., Georgia*, 433 U.S. 25, 27 n. 2, 53 L. Ed. 2d 557, 97 S. Ct. 2490 (1977); *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.), cert. denied, 454 U.S. 1031, 70 L. Ed. 2d 474, 102 S. Ct. 567 (1981)). Strictly speaking, this is not a motion to dismiss. However, that animal seems most closely related to what we have before us.

When assessing the sufficiency of a plaintiff's complaint for dismissal or judgment on the pleadings, all allegations and reasonable inferences must be construed in the plaintiff's favor. *AFGE Local 1 v. Stone*, 502 F.3d 1027, 1032 (9th Cir. 2007) (construing allegations of complaint and inferences therefrom in light most favorable to plaintiff in reversing district court's dismissal for lack of subject matter jurisdiction); *Vasquez v. L.A. Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007) (stating that upon consideration of dismissal, "we accept all material allegations of

fact as true and construe the complaint in a light most favorable to the non-moving party"); *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005) (requiring courts to evaluate dismissal of a complaint by construing the document and all inferences drawn from it in a light most favorable to the non-moving party).  Thus, it is a thoroughly settled premise that the Plaintiff, when having its Complaint targeted for dismissal, is entitled to an interpretation of its Complaint and all inferences that may be drawn from it in the Plaintiff's favor.

If the Defendants' default were not damaging enough to their legal position, their failure to respond to the instant action is further justification for the entry of judgment.  Silence in the face of probative evidence and allegations in civil matters calls for the finder of fact to draw adverse inferences about the Defendant's conduct. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *Pedrina v. Chun*, 97 F.3d 1296, 1300 (9th Cir. 1996); *Lizarraga v. City of Nogales*, Case No. 2:06-cv-00474, 2007 U.S. Dist. LEXIS 5637 at *7 (D. Ariz. Jan. 25, 2007).  In a civil action, there is no requirement for the fact-finder to meet silence with neutrality.  *Baxter*, 425 U.S. at 318.  To the contrary, a refusal to answer questions - or even show up to Court - may and should be met with a negative inference. *Id*.

Weighing these considerations together, there is no basis for the Court to accord any benefit or favorable inference to the Defendants.  As the Court is considering whether to dismiss the Plaintiff's complaint, Plaintiff is entitled to have its pleading and related inferences considered in a light most favorable to its interests.  Simultaneously, the Defendants' silence – rising to the level of disregard for the judicial process through their refusal to appear – supports inferences *against* the Defendants, not *for* them.  Such negative inferences are eminently proper in this case, as there is no reason for the Defendants' failure to accord it any degree of attention.  Therefore, the Court is left with the requirement of making all reasonable inferences in the Plaintiff's favor, and the discretion - which begs to be used in this instance - to make negative inferences against the Defendants.

These defaulting Defendants have been served. (Docs. 16, 17, 20-2)  These defaulting Defendants were fully aware of the action against them. (Doc. 7-4).  Default was entered. (Doc. 22).  They are entitled to no positive inferences.  However, the Plaintiff is entitled to such

inferences.  Even without such a proper balancing of inferences, this case should be resolved in favor of the Plaintiffs.

**II.   The Facts in The Record Support the Conclusion That Significant Portions of the Infringement Took Place Inside the United States, thus Eliminating the Extraterritoriality Issue.**

Even without the benefit of positive inferences, there are adequate facts in the record to support the conclusion that at least part of the infringement took place inside the United States, thus giving rise to U.S. liability.  See *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 225 (S.D.N.Y. 2002) (supporting a New York based newspaper's claim of copyright infringement based upon Canadian agent's display on its Internet website because the website could be accessed from the United States).

The Defendants' infringement was on vinigay.com. (Doc. 1-2, 24-4, 24-5)  This domain name was registered in Arizona.  (Doc. 24-1 at 2).  The domain name registration is the foundational act for all of the infringements, and the domain name registration took place in Arizona.  Therefore, the most important portion of the infringement took place not only in the United States, but in the State of Arizona.  (Doc. 25 at ¶ 16-17).  The Defendants sold subscriptions for profit, by using the Plaintiff's works.  (Doc. 1-3, 1-4, 24-1 at ¶ 26).  These subscriptions were not sold in Brazilian Reals, they were sold in U.S. Dollars. *Id.*

Least speculatively, and most importantly, the act of copyright infringement is complete upon receipt of the infringing materials.  See *United Feature Syndicate,* 216 F. Supp. 2d at 225; *Allarcom Pay Television Ltd. v. Gen. Instrument Corp*., 69 F.3d 381, 387 (9th Cir. 1995) (holding that a copyright infringement was not complete until a signal sent from the United States was received in Canada).  In this case, the Plaintiff's staff reviewed vinigay.com and viewed the Plaintiff's videos on the website. (Doc. 24-2 at ¶ 6, 24-3 at ¶ 2.)  Therefore, not only can we conclude that publication (and thus the completed act of infringement) took place in the

United States by virtue of the fact that the website was accessible in then United States[1], we have at least two people who were in San Diego at the time that they viewed the Vinigay site while it contained the infringing material. (Docs. 24-2 ¶ 6, 24-3 ¶ 2)

In this case, if "N" is the number of infringements viewed in the United States, thus the number of <u>complete</u> acts of infringements in the United States, then the following is indisputably true: $N \geq 9$.  There are three Corbin Fisher films at issue. (Docs. 1-7, 6 ¶ 29, 24-9)  Eric Gapp viewed each at least once. (Doc. 24-2 at ¶ 6)  Henry Leonard viewed each at least once. (24-3 at ¶ 2)  Furthermore, the Plaintiff's counsel viewed them all at least once, in order to prepare the Complaint.  $N \geq 9$.

Additionally, each film was viewed thousands of times.  Cody Fucks Lucas was viewed 10,137 times (24-3 at ¶ 4) "Dave Fucks Dawson" was viewed 14,655 times (24-3 at ¶ 4).  Cain Fucks Travis was likely viewed at least 10,000 times.  The sheer number of views makes it a statistical impossibility that <u>none</u> of the illegal distribution took place in the United States.  In fact, there is nothing in the record to support the contention that **any** of the over 25,000 infringing views took place anywhere but the United States, and thus absent the Defendants putting such facts in the record, they should be presumed to have taken place here as supported by the allegations in the complaint. (Doc. 6 ¶ 7) Absent such a showing, it would be improper for the court to infer that they all took place outside the United States. See *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988) (where Defendant argued that infringement took place in Israel, not the United States, but did not produce **evidence** of that fact, then copyright infringement judgment based upon a portion of the infringement taking place in the U.S. affirmed).  Therefore, of all of these thousands of documented views, it is reasonable to infer that **at least one** of these views, if not a large percentage (or all of them), were viewed in the United States.  Accordingly, if even ONE of them each were attributable to an American viewer, then $N \geq 12$.

---

[1] *United Feature Syndicate,* 216 F. Supp. 2d at 225; *Allarcom Pay Television Ltd.*, 69 F.3d at 387.

**III.   In order to apply the extraterritoriality exception, the infringement must take place <u>entirely</u> outside the United States.   Since it did not, there is no extraterritorial immunity afforded to the Defendants.**

The Copyright Act's extraterritoriality rule only applies to acts of copyright infringement that take place **entirely** outside of the United States.  In this case, the Defendants claim to be in Brazil, but there is no evidence that this is anything but a ruse.  Even if they are in Brazil, the acts complained of did not take place **entirely outside** of the United States.  17 U.S.C. § 106(3) grants the owner of a copyright the exclusive right to distribute copies of the copyrighted work to the public.  Courts interpret the term "distribute" in light of the statute's plain meaning and legislative history.  Infringement of the distribution right occurs when there is a dissemination of copies of the Plaintiff's works.  The dissemination is clearly proven by record evidence, and at least part (if not all) if that distribution took place in the United States.

To establish copyright infringement, Plaintiffs must show that they own the copyrights that have been infringed, and that third parties have made unauthorized copies, downloads, or transfers of this material.  17 U.S.C. § 106(1), (3).  The Ninth Circuit determined that "United States copyright laws do not reach acts of infringement that take place entirely abroad." *Subafilms, Ltd. v. MGM-Pathe Comm'ns Co.*, 24 F.3d 1088, 1098 (9th Cir. 1994) (en banc), cert. denied sub nom. *Subafilms, Ltd. v. United Artists Corp.*, 513 U.S. 1001, 115 S. Ct. 512, 130 L. Ed. 2d 419 (1994).  A later 9th Circuit panel wrote, "in order for U.S. copyright law to apply, at least one alleged infringement must be completed entirely within the United States." *Allarcom Pay Television,* 69 F.3d at 387 (9th Cir. 1995).  See 4-17 Nimmer on Copyright § 17.02 ("[A] distinction should be drawn between purely extraterritorial conduct, which is itself nonactionable, and <u>conduct that crosses borders</u>, so that at least a part of the offense takes place within the United States. . . . It may be concluded . . . that U.S. courts may entertain such multiterritorial infringement claims.") (emphasis added)

A recent case illustrates the fact that the extraterritoriality rule requires complete separation from the United States in order for it to apply.  In *Columbia Pictures Indus. v. Fung*, 2009 U.S. Dist. LEXIS 122661, 96 U.S.P.Q. 2d (BNA) 1620 (C.D. Cal. Dec. 21, 2009) the

Central District of California was confronted by a Defendant who argued that the Plaintiff "must provide evidence that both the transferor and the transferee are located in the United States." *Id.* at *29. The court rejected that argument.

> However, United States copyright law does not require that both parties be located in the United States. Rather, the acts of uploading and downloading are each independent grounds of copyright infringement liability. Uploading a copyrighted content file to other users (regardless of where those users are located) violates the copyright holder's § 106(3) distribution right. Downloading a copyrighted content file from other users (regardless of where those users are located) violates the copyright holder's § 106(1) reproduction right. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001). Accordingly, Plaintiffs need only show that United States users either uploaded or downloaded copyright works; Plaintiffs need not show that a particular file was both uploaded and downloaded entirely within the United States.

*Id.* at *29-30.

It is true that in this case the Plaintiff did not *specifically allege* the precise fact that there was an act of infringement inside the United States. However, the Plaintiff did allege that the wrongs complained of occurred in this district. (Doc. 6 ¶ 7) Furthermore, the Plaintiff alleged that its employees discovered the infringement. (Doc. 6 ¶ 40). These allegations, plus the facts in the record support the conclusion that at least part of the infringement took place inside the United States, and to the extent that the complaint fails to adequately allege this fact, the record certainly supports such a conclusion.[2] See 4-17 Nimmer on Copyright § 17.02 ("it would seem upon a straightforward application of the statute that, regardless of how much infringing conduct may or may not occur abroad, when violation of one of the exclusive rights in copyrighted works is completed within the United States, the activity becomes actionable under domestic law."). In this case, the Plaintiff's rights under 17 U.S.C. § 106 were violated inside the United States. (Docs. 24-2 ¶ 6, 24-3 ¶ 2) The Defendants illegally duplicated the Plaintiff's works in the United

---

[2] Even if the Plaintiff's complaint failed to specifically allege that part of the infringement took place in the United States, lack of such a specific allegation is not necessary, and if the Court feels otherwise, it should be resolved through the Court granting leave to amend the complaint – not by dismissal with prejudice.

States. *Id.* They distributed them from U.S. servers. (Doc. 24-5) Then they distributed them to Americans. Extraterritoriality is inapplicable here.

In a more recent case in the District of Nevada, a court was confronted with a motion to dismiss on extraterritorial grounds. See *Righthaven, LLC v. Majorwager.com, Inc.*, 2010 U.S. Dist. LEXIS 115007, *14-16, 96 U.S.P.Q.2d (BNA) 1768 (D. Nev. Oct. 28, 2010). In that case, the court considered an argument raised by defense counsel that a foreign defendant could not be held liable under the U.S. Copyright Act because the plaintiff failed to allege an act of infringement within the United States. *Id.* The Court wrote:

> While Plaintiff's Complaint in this case does not specifically allege that the alleged infringement occurred within the United States, when adjudicating the defendant's motion to dismiss under Fed.R.Civ.P. 12(b)(6), all reasonable inferences from the complaint's factual allegations must be drawn in favor of the plaintiff. *Usher v. Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). The complaint does allege that the articles copied were "from a source emanating from Nevada." Furthermore, it is not difficult to infer that since Righthaven discovered the infringing material on Majorwager's website, it likely did so in its Nevada office and therefore any infringement on the part of Defendant took place within the United States.

*Id.* at *15.

See also *Litecubes, LLC v. N. Light Prods.*, 523 F.3d 1353, 1371-1372 (Fed. Cir. 2008) ("Substantial evidence supports the jury's conclusion that, by selling to customers in the United States, GlowProducts' distribution of the accused products has taken place, at least in part, in the United States.").

Unauthorized copying and public display of a copyrighted work within the United States triggers the application of U.S. copyright law. See *L.A. News Serv. v. Reuters Television Int'l*, 149 F.3d 987, 991 (9th Cir. 1998); 17 U.S.C. § 106. The record reflects that both took place. (Doc. 24-2 at ¶ 6; 24-3 at ¶ 2) Additionally, unauthorized importation into the United States of copies acquired extraterritorially triggers the application of U.S. copyright law. *BMG Music v. Perez*, 952 F.2d 318, 319 (9th Cir. 1991) (citing 17 U.S.C. § 602(a)).

> The Court finds that in this case, the alleged act of direct copyright infringement - uploading a video from Canada to YouTube's servers in California for display within the United States - constitutes an act of infringement that is not "wholly extraterritorial" to the United States. Those cases holding that the Copyright Act

requires at least one infringing act to occur entirely within the United States dealt with situations in which the infringing transmission was authorized or sent from within the U.S. but received and accessed abroad. See *Allarcom*, 69 F.3d 381; *Reuters Television*, 149 F.3d 987. In this case, however, we face the opposite scenario. The allegedly infringing act in this case began in Canada, where Defendant created his Grandma song video. Had Defendant stopped there, there is no doubt that the strict presumption against extraterritoriality would apply and Plaintiff would not have a claim. As noted in the Court's January 11, 2011 Order: "The creation of the video, however, occurred entirely in Canada, and thus cannot constitute copyright infringement under well-settled law. See, e.g., *Doe v. Geller*, 533 F. Supp. 2d 996, 1003 (N.D. Cal. 2008) ('United States copyright laws do not apply extraterritorially.')."

The problem is that Defendant did not stop at the mere creation of the Grandma song video in Canada, but instead allegedly uploaded it to YouTube's California servers for display in the United States after agreeing to YouTube's Terms of Service agreement. Thus, according to the allegations in the SAC, Defendant's direct action led to the creation of a copy of the Grandma video on YouTube's servers in California, and to the subsequent viewing of the video by potentially thousands in the United States. Drawing all reasonable inferences in the Plaintiff's favor, as the Court must in ruling upon Defendant's motion to dismiss, Plaintiff's SAC does now sufficiently allege an act of copyright infringement within the United States. See, e.g., *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 224 (S.D.N.Y. 2002) (denying defendants' motion to dismiss copyright claim based on factual allegations, and reasonable inferences in support thereof, that "allegedly infringing material was accessible from computers within the United States and that it is prepared to prove that the defendants' alleged copyright infringement had an effect within the United States.").

*Shropshire v. Canning*, 2011 U.S. Dist. LEXIS 93705, *12-18 (N.D. Cal. Aug. 22, 2011)

If acts beginning in the United States but culminating overseas are considered to be under the purview of the copyright laws in the country of destination, as *Allarcom* and *Reuters Television* concluded, then it is logical to conclude that the allegedly infringing acts here fall within the purview of the Copyright Act, given that the acts of infringement **at least culminated** in the United States. In a similar case, *L.A. News Serv. v. Conus Commc'ns Co. Ltd.*, 969 F. Supp. 579 (C.D. Cal. 1997), the court reached the same conclusion. *Conus* held that the Copyright Act covered a Canadian broadcaster who transmitted a signal containing material that infringed a United States copyright when that broadcast signal, intended for Canadian homes, was also picked up by 8,000 televisions in the United States. *Id.* at 582-83. The court in *Conus*

held that the broadcaster could be held liable under the Copyright Act even though the broadcaster never intended for the signal to reach audiences in the United States as long as there was infringement within the United States. *Id.* There is no difference between that transmission and the Defendants' unlawful distribution of the Plaintiff's works.

**IV.     Even if the infringement took place entirely outside the United States, an exception to the extraterritoriality rule applies to this case.**

There is no question that acts of copyright infringement that take place <u>entirely</u> outside the United States are not actionable in U.S. Courts. However, in this case, at least part of the events took place inside the United States, as discussed *supra*. Furthermore, even if this were not the case, there is an exception to the extraterritoriality rule, which would apply. See *Update Art, Inc.*, 843 F.2d at 73. In that case, the Second Circuit explained, relying on 9th Circuit law, that there is an exception to the extraterritoriality principle. "There is an exception -- when the type of infringement permits further reproduction abroad -- such as the unauthorized manufacture of copyrighted material in the United States." *Id.* (citing *Peter Starr Prod. Co. v. Twin Cont'l Films, Inc.*, 783 F.2d 1440, 1443 (9 Cir. 1986); *Robert Stigwood Grp. Ltd. v. O'Reilly*, 530 F.2d 1096, 1100-01 (2 Cir.), cert. denied, 429 U.S. 848, 50 L. Ed. 2d 121, 97 S. Ct. 135 (1976)).

In this case, the principles are the same even if the technology is not. The record does not reflect that the Defendants **legally** downloaded the Plaintiff's copyrighted motion pictures. The Defendants most likely illegally used stolen passwords or stolen credit card numbers to obtain the Plaintiff's copyrighted works. See Declaration of Brian Dunlap at ¶ 10, Attached hereto. Had the Defendants not defaulted, and had they participated in this case, discovery might have provided opportunities to conclusively prove this fact. However, since they defaulted, the Plaintiff is left with what was discoverable in its own records. Evidence is attached to this Response that creates the reasonable inference that the Defendants illegally obtained the copyrighted films. See Declaration of Brian Dunlap at ¶ 5. In fact, there is no way they could have legally obtained them. *Id.* at ¶ 5-6.

**V.   *Subafilms v. MGM*, While not overruled, is distinguishable, and heavily distinguished by other cases, and should not be followed**

In this case, the mere act of illegally downloading the films permitted further reproduction abroad.  Therefore, even if the acts are extraterritorial, the exception applies.  Even if *Subafilms* controlled this case, which the facts and the law show it should not, the logic supporting *Subafilms* does not translate to the reality of the Internet.  Therefore, it is time for courts to recognize that fact and to distinguish *Subafilms* in light of new technology.

This Court's interpretation of the Copyright Act's extraterritorial reach is informed primarily by *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1096-98 (9th Cir. 1994).  By *Subafilms'* own language, though, the extraterritorial limitation of the Copyright Act is not immovable - instead, it is like other regimes of federal rights protection and is presumed, rather than required, to not operate extraterritorially. *Id*. at 1096; see *Envtl. Def. Fund, Inc. v. Massey,* 986 F.2d 528, 531 (D.C. Cir. 1993) (noting that the Sherman Act, Lanham Act, and securities laws have been applied to extraterritorial conduct).

Even the *Subafilms* court acknowledged that the presumption against extraterritorial application of U.S. laws may be overcome when declining to apply them "would result in adverse effects within the United States." 24 F.3d at 1096 (internal citations omitted).  Selectively applying the ruling in *EEOC v. Arabian Am. Oil Co.* (*Aramco*), 499 U.S. 244 (1991), the *Subafilms* court declined to apply the Copyright Act extraterritorially because the Supreme Court had declined to extraterritorially apply Title VII of the Civil Rights Act. *Subafilms*, 24 F.3d at 1095-96.  Yet, shortly following the *Aramco* decision, Congress effectively overruled the Supreme Court's decision through legislation with the Civil Rights Act of 1991. See The Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Sta. 1077 (reprinted in 42 U.S.C. § § 1981 et seq.).  The foundation upon which the *Subafilms* decision rests has been kicked out from under it, and it is now an outdated and exception-riddled and outdated derelict of a case.

Virtually every other statutory regime protecting markets and rights owners has been accorded extraterritorial application, or has been given approval to be applied extraterritorially, based on the effects of wrongdoing within the U.S.  The extraterritorial reach of criminal statutes

1. was acknowledged in *United States v. Bowman*, 260 U.S. 94, 98 (1922), wherein the Supreme Court held that "limiting the statute to the strictly territorial jurisdiction *would greatly curtail the scope and usefulness of the statute*, and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home." (emphasis added) "Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but *allows it to be inferred from the nature of the offense.*" *Id.* (emphasis added).

Similar analysis has been provided on the United States' antitrust laws. In *United States v. Aluminum Co. of Am.* (*Alcoa*), that if a party's conduct is "intended to affect [...] and did affect [the U.S. businesses]," then that party is liable for its anticompetitive conduct abroad. 148 F.2d 416 (2d Cir. 1945). Securities laws have received similar treatment. In *Schoenbaum v. Firstbrook*, the Second Circuit held that the presumption against extraterritorial application is rebutted when the application of the Securities and Exchange Act is "necessary" to protect American investors. 405 F.2d 200, *rev'd on other grounds*, 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied*, 395 U.S. 906 (1969). Judge Friendly reached a similar conclusion in *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 993 (2d Cir.), *cert. denied*, 423 U.S. 1018 (1975), justifying extraterritorial application of securities laws based on "case law and commentary concerning the application of the securities laws and other statutes to situations with foreign elements and our best judgment as to what Congress would have wished if these problems had occurred to it." See also *Zoelsch v. Arthur Anderson & Co.*, 824 F.2d 27 (D.C. Cir. 1987).

Analogously, the Lanham Act has enjoyed a broad sweep in extraterritorial application. In fact, "It is well-established that United States courts have jurisdiction to enforce the Lanham Act extraterritorially in order to prevent harm to United States commerce." *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 745 (2d Cir. 1994). In *Sterling Drug*, the Second Circuit ordered the district court to modify its injunction against the foreign use of the appellee's trademark, because of the detrimental effects such use would have in national commerce. Similarly, in *Steele v. Bulova Watch Co., Inc.*, 344 U.S. 280 (1952), the Supreme Court approved an injunction against an individual who purchased watch parts in the U.S. and assembled them within Mexico,

illegally branding the watches as "Bulova," because of the trademark infringement's harmful effect on United States commerce.

In this case, the effects of Defendants' conduct are clear and unambiguous. Defendants' terms of use are in English. (Doc. 34-1) The website featured content predominantly, if not exclusively, from American studios. (Doc. 6 ¶ 24) The actors in the content displayed on the Defendants' website speak English almost exclusively, and even their offers to purchase subscriptions to services such as megaporn.com are denominated in U.S. Dollars. (Doc. 6 ¶ 24) The Defendants further registered the <vinigay.com> domain name within the United States, and clearly intended to target the American market - through the unfettered piracy of other United States-based companies that expended time and effort to create the content Vinigay simply gave away. There is no basis on the record for belief that Vinigay operated for any other purpose, or through any other means. Yet, the Complaint clearly establishes how Vinigay has harmed Plaintiff's business and its legal rights. In this case, the effects of Vinigay's conduct affect the Plaintiff and others within the United States, and directly align with prior precedent supporting the extraterritorial application of its laws.

## V.   Conclusion

The extraterritoriality principle under the Copyright Act is not intended to give carte blanche to foreign infringers. Furthermore, without the benefit of discovery, we do not even know if these infringers are indeed in Brazil, nor if they are indeed in Prescott, Arizona. The mere fact that they claim to be in Brazil is not dispositive. Nevertheless, if this court were to adopt the principle that it seems to suggest in its order to show cause, it would throw the entire copyright regime into chaos. All any infringer would need to do would be to locate outside the US and then publish a website accessible in the US and sell subscriptions to Americans to that website and there would be no recourse except to bring suit in that country. Doing so, quite simply, would deny justice to American copyright holders. If service of process cannot be effected in Brazil (Doc. 10) and if this court was convinced of that fact, this court cannot reasonably conclude that Brazilian courts would be the proper place for this American small business to find justice.

1  The fact is that platintiffs are "entitled to recover damages flowing from exploitation
2  abroad of the domestic acts of infringement committed by defendants." See *Reuters Television*
3  *Int'l*, 149 F.3d at 992 (9th Cir. 1998).  In this case, as Brian Dunlap has testified in his
4  Declaration, the Defendants could not have procured the infringing films anywhere but from the
5  Plaintiff's website.  Declaration of Brian Dunlap ¶ 10.  Therefore, the root of the infringing act
6  was the illegal copying of the films in the first place.  The trunk of the infringing act consisted of
7  the publication of the infringing materials on American name servers hosted in Arizona.  The
8  leaves were each individual view of the infringing materials. *Reuters Television Int'l* modified
9  the *Subafilms* decision, and that modification directly applies to this case.  The Defendants can,
10 and should, be held liable for their actions and should not escape without consequence simply
11 because they claim to be in Brazil.  See 4-17 Nimmer on Copyright § 17.02.

13 Date: November 29, 2011.

s/ Marc Randazza
Marc Randazza, Arizona Bar No. 027861
Randazza Legal Group
6525 Warm Springs Rd. Suite 100
Las Vegas, NV 89118
888-667-1113
305-437-7662 (fax)
MJR@randazza.com